Eric Adam Biderman
biderman.eric@arentfox.com
ARENT FOX LLP
1675 Broadway
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARNOLD YOUNG, | Civil Action No. |
| Plaintiff, | |
| -against- | **COMPLAINT AND** |
| HERMAN SEGAL | **JURY TRIAL DEMAND** |
| Defendant. | |

Plaintiff Arnold Young ("Plaintiff" or "Mr. Young"), by and through his undersigned attorneys, hereby files this Complaint against defendant Herman Segal ("Defendant" or "H. Segal"), and in support thereof, avers as follows:

1.     This is an action involving a series of transactions that are commonly known as Stranger-Originated Life Insurance ("STOLI") that were fraudulently perpetrated by the Defendant.

2.     Defendant H. Segal induced an innocent party, Mr. Young, to participate in the transactions in which H. Segal and parties he was working with would procure and finance several policies of life insurance on Mr. Young's life for the purpose of later selling those policies in one or more life settlement transactions.  In addition, H. Segal sought to ensure Mr. Young's continued participation in such transaction by knowingly withholding from Mr. Young

information that, if known, would have caused Mr. Young to cease his participation in the transaction.

3.      Contrary to H. Segal's prior representations, Mr. Young has incurred liability as a result of such STOLI transactions.  In particular, Mr. Young was forced to incur extensive costs and expenses to defend, and eventually bring about settlement of, a lawsuit that was brought against Mr. Young solely as a result of the STOLI transactions originated by H. Segal and a letter of guaranty that was forged in the name of Mr. Young.  Additionally, Mr. Young was forced to incur further legal costs and expenses in connection with a second lawsuit that was, again, brought against him solely as a result of the STOLI transactions originated by H. Segal and the letter guaranty that was forged in the name of Mr. Young.

4.      As such, Mr. Young brings this action to recover from H. Segal the costs and expenses that Mr. Young has incurred as a result of H. Segal's express promise to indemnify and his fraudulent conduct.

## PARTIES

5.      Plaintiff Arnold Young now is, and was at all times mentioned below, domiciled in and a citizen of the State of New Jersey, residing at 110 John Street, Clark, New Jersey, 07066-1804.

6.      Upon information and belief, Defendant Herman Segal is domiciled in and a citizen of the State of New York.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), because: (a) the amount in controversy exceeds $75,000, exclusive of interests and costs; and (b) there is complete diversity between Plaintiff and Defendant.

8.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of New Jersey.

### EVENTS

9.     In early 2008, Mr. Young met with an attorney named Alan Rubenstein ("Rubenstein"), who presented Mr. Young with an opportunity to potentially provide his children with a future financial benefit.  The opportunity called for Mr. Young to allow his life to be insured by an investment group.  At this meeting with Mr. Young in early 2008 (the "First Meeting"), Rubenstein advised Mr. Young that the opportunity would be at no cost to Mr. Young or to his children, and assured Mr. Young, as an attorney, that the opportunity would be lawful and would be handled by professionals.

10.     Subsequent to the First Meeting, also in early 2008, Mr. Young had a second meeting with Rubenstein, during which Rubenstein introduced Mr. Young to H. Segal, the Defendant (the "Second Meeting").

11.     At the Second Meeting, H. Segal formally presented Mr. Young with the financial opportunity that Rubenstein had mentioned at the First Meeting.  In particular, H. Segal advised Mr. Young that H. Segal was involved in a partnership called Omega Capital ("Omega"), and that Omega, along with other parties that Omega was working with at the time, wanted to engage in a transaction to fund one or more life insurance policies that would be issued on Mr. Young's life (hereafter referred to as the "Transaction").  H. Segal advised Mr. Young that the Transaction would involve the establishment of life insurance trusts that would own policies issued on Mr. Young's life (the "Policies") and that H. Segal and/or Omega would make all arrangements to pay premiums on the Policies.  According to H. Segal, Omega would loan the trusts the necessary funds to pay premiums on the Policies.  H. Segal also advised Mr. Young

3

that Mr. Young would have no involvement in the Transaction, other than signing the applicable policy applications and providing access to medical records and information, and that neither Mr. Young nor his family would bear any of the costs of the Policies or face any liabilities as a result.

12.     Based on the statements and representations made by H. Segal, Mr. Young agreed to participate in the Transaction.

13.     Upon information and belief, at or before the time that Mr. Young agreed to participate in the Transaction, H. Segal, and/or persons acting on his behalf, had arranged for several of the Policies to be funded through loans provided by an entity named HM Ruby Fund, L.P. ("HM Ruby").  HM Ruby ultimately provided loans to fund one or more of the Policies.  As alleged below, Mr. Young did not become aware of HM Ruby's involvement with the Policies until well after the time he agreed to participate in the Transaction.

14.     Upon information and belief, H. Segal was aware of HM Ruby's involvement with the Policies at the time Mr. Young agreed to participate in the Transaction.  Nonetheless, H. Segal did not make Mr. Young aware of such involvement at the time he agreed to participate in the Transaction.

15.     On November 3, 2008, H. Segal provided Mr. Young with a "Term Sheet" that provided details about the Policies and how they were to be funded (hereafter, the "Term Sheet").  A copy of this Term Sheet is attached as Exhibit "A."

16.     Subsequent to receiving the aforementioned Term Sheet, Mr. Young received a document titled "Draft 11/10/08 (For Discussion Purposes Only) Agreement" (hereafter, the "Draft Agreement") from H. Segal.  The Draft Agreement, a copy of which is attached as Exhibit "B", contains much more detailed information about the Term Sheet.

17.     Both the Draft Agreement and the Term Sheet show amounts of policy funding, totaling in excess of $4.5 million, and provide that the funding would be advanced by Omega and/or H. Segal, consistent with what H. Segal had told Mr. Young in early 2008.

18.     Paragraph 2 on page 3 of the Draft Agreement contained the following information that was most important to Mr. Young:

> Pursuant to the schedule below, Omega Capital will advance funds to the Trusts to pay for the first 2 years of premium payments.  The only parties to these loans are Omega, as lender, and the Trusts, respectively, as borrowers.  The loans are non-recourse.  The loan is collateralized only by the Policy.  Neither Arnold Young, the Beneficiaries, nor the Trustees have any legal obligation with respect to the loans.  Any outstanding loan balance is payable solely from the receipt of sale proceeds upon the sale of any Policy or upon the payment of any death benefit.

Draft Agreement (Exhibit B), ¶ 2.

19.     Upon information and belief, at the time H. Segal provided the Draft Agreement and Term Sheet to Mr. Young, the policy at issue in this action, the Principal Policy (as such term is defined below), had already been funded through a loan from HM Ruby.  H. Segal did not advise Mr. Young as to such HM Ruby loan at the time he provided Mr. Young with the Draft Agreement and Term Sheet.  Upon information and belief, H. Segal was aware of such HM Ruby loan at the time he provided the Draft Agreement and Term Sheet to Mr. Young.  Upon information and belief, at the time H. Segal provided the Draft Agreement and Term Sheet to Mr. Young, he was aware that such HM Ruby loan required, as a condition, that Mr. Young personally guaranty such loan, which was contrary to what Mr. Young had been told about the Transaction by H. Segal and Rubenstein, and contrary to the provisions of the Draft Agreement and Term Sheet.

5

20.     Both the Draft Agreement and Term Sheet reference the creation of insurance trusts, and name specific trusts, each bearing Mr. Young's name in the title.  Mr. Young did not execute any trust agreement in 2008.  However, in 2011, Mr. Young had six individual trusts prepared, which Mr. Young subsequently executed and which H. Segal arranged to have executed by the trustees who were named in the Draft Agreement.  Those trust agreements are all dated effective March 2011.

21.     On or about June 25, 2013, an entity called Apliko, LLC ("Apliko") commenced an action against the Plaintiff in New York Supreme Court, New York County captioned: *Apliko, LLC v. Arnold Young,* Index No. 652226/2013 (the "Apliko Action").  The Apliko Action, which was commenced by way of summary judgment in lieu of complaint, sought to recover from Mr. Young the unpaid balance of a loan (the "Loan") that HM Ruby had provided in connection with one of the Policies.  The Policy to which the Loan related was a $10 million life insurance policy, bearing Policy Number 6095482 that was issued on Mr. Young's life by Principal Life Insurance Company on or about May 15, 2008 (the "Principal Policy").

22.     In the Apliko Action, Apliko alleged that, pursuant to the Loan, HM Ruby had lent the sum of $1,042,134 to a life insurance trust named the Arnold Young Irrevocable Life Insurance Trust (the "Young Trust").  Apliko alleged, in particular, that the Loan was evidenced by a credit agreement entered into by and between the Young Trust and HM Ruby as of August 26, 2008 (the "Credit Agreement"), and a promissory note executed by the Young Trust in favor of HM Ruby, and dated as of August 26, 2008 (the "Note").

23.     Apliko also alleged that, in connection with the Loan, Mr. Young had executed a personal guaranty dated August 26, 2008 (the "Guaranty"), in which Mr. Young guaranteed prompt payment of all sums due and owing to HM Ruby, and to its successors and assigns, under the Loan.

24.     Among the papers filed by Apliko in the Apliko Action were purported copies of the Credit Agreement, Note and Guaranty. The copy of Guaranty provided by Apliko indicated that it was executed by Mr. Young on August 26, 2008.  The purported copy of the Credit Agreement provided by Apliko also indicated that it was executed by Mr. Young.  Furthermore, the alleged signatures of Mr. Young appearing on the Credit Agreement and Guaranty were purported to have been notarized on September 2, 2008.

25.     In the Apliko Action, Apliko asserted a single claim against Mr. Young for repayment of the outstanding balance under the Loan.  In particular, Apliko contended that the Young Trust had failed to make payment when due under the Loan and that, as a result, Mr. Young was required, pursuant to the Guaranty, to repay the outstanding Loan balance.  Apliko claimed that the amount required to paid by Mr. Young under the Guaranty consisted of the following sums: $1,042,134, representing the original principal balance of the Loan; interest that accrued on the principal balance of the Loan from August 26, 2008 at a rate of 10% per annum; and attorneys' fees and costs incurred by Apliko in connection with its collection efforts against Mr. Young.

26.     Apliko had the necessary standing to bring the Apliko Action because it was an assignee under the Loan.   Prior to the commencement of the Apliko Action, HM Ruby purportedly assigned all of its right, title and interest in the Loan to an entity called Teleios PF

Loans DE, LLC ("Teleios").  Teleios purportedly assigned to Apliko all of the right title and interest in the Loan that purportedly had been assigned to Teleios by HM Ruby.

27.     The Apliko Action came as a surprise to Mr. Young because, as previously noted, Mr. Young had never been asked by anyone associated with the Transaction to guarantee any obligation.

28.     At the time of Apliko Action, and at times subsequent thereto, Mr. Young reviewed the Credit Agreement and Guaranty that were filed as part of the Apliko Action.  Mr. Young does not recognize his purported signature on either document to be his own, and does not recall having executed the Credit Agreement, Guaranty, or any document(s) similar thereto. In addition, Mr. Young does not recall having appeared before a notary public, for any purpose, in and around September 2, 2008, the date on which his purported signatures on the Credit Agreement and Guaranty were allegedly notarized.  Mr. Young is certain that he would have refused to sign documents like the Credit Agreement and Guaranty had he been asked to do so.

29.     Furthermore, the Credit Agreement purports to have been entered into by a trust bearing the name of the Young Trust in 2008, even though Mr. Young did not execute any trust agreement of any kind in 2008.  As noted above, Mr. Young executed several trust agreements in March 2011, one of which was an agreement for the Young Trust.  Such trust agreement was the only trust agreement for the Young Trust that Mr. Young ever executed.

30.     On July 17, 2013, Mr. Young removed the Apliko Action to the United States District Court for the Southern District of New York, where it continued to proceed under the caption, *Apliko, LLC v. Arnold Young,* Case No. 13-cv-04948(AKH)(FM) (S.D.N.Y.).

31.     In October 2013, Mr. Young and Apliko agreed to settle the Apliko Action.  As part of this settlement, Mr. Young agreed to pay Apliko the sum of $125,000.  Despite the settlement, Mr. Young incurred substantial legal fees and costs to defend, and eventually bring about the settlement of, the Apliko Action.

32.     Shortly after the commencement of the Apliko Action, Mr. Young contacted H. Segal to advise him of the Apliko Action and to request H. Segal's assistance in both paying the legal expenses and proving that H. Segal, or persons working at his direction, forged the signature of Mr. Young.  As H. Segal: (i) previously represented to Mr. Young, verbally, that the signatures were forged; and (ii) previously represented to Mr. Young, verbally and in writing, that neither Mr. Young nor his family would incur any liability in connection with the Transaction, Mr. Young specifically sought assurances from H. Segal that H. Segal and/or Omega would indemnify Mr. Young for any and all costs and expenses incurred by Mr. Young in connection with the Apliko Action.  Consistent with H. Segal's prior representations to Mr. Young, H. Segal initially advised Mr. Young that H. Segal would fully indemnify Mr. Young for any and all costs and expenses incurred by Mr. Young in connection with the Apliko Action. However, when Mr. Young subsequently contacted H. Segal to move forward with the indemnity that H. Segal had previously agreed to provide Mr. Young, they received no response.

33.     Shortly after the commencement of the Apliko Action, Mr. Young also provided H. Segal with copies of the Credit Agreement and Guaranty.  Upon being presented with the Credit Agreement and Guaranty, H. Segal indicated that Mr. Young's purported signatures on both documents were forgeries.  At no time prior did H. Segal ever provide Mr. Young with copies or either document, or advise Mr. Young about the forgeries of Mr. Young's signatures on the documents.  Upon information and belief, H. Segal had long been aware of the forgeries of

Mr. Young's signatures on the Credit Agreement and Guaranty because H. Segal and/or persons acting at the direction of H. Segal were responsible for the forgery of Mr. Young's signatures on both documents.

34.     Subsequent to the settlement of the Apliko Action, on or about January 10, 2014, Principal Life Insurance Company commenced the following action against Mr. Young, H. Segal and others in the United States District Court for the District of New Jersey: *Principal Life Insurance Company v. Young et al.,* Case No. 14-cv-00198 (D.N.J.) (the "Principal Action").  As a result of the Principal Action, Mr. Young incurred legal costs and expenses in addition to those costs and expenses incurred by him in connection with the Apliko Action.

35.     Upon information and belief, the Principal Action came about because Apliko sought to enforce certain rights related to the Principal Policy that are purportedly provided under the Loan.  Upon information and belief, the rights sought to be enforced by Apliko in the Principal Action were purportedly assigned to Apliko pursuant to the above-mentioned Loan assignments involving HM Ruby, Teleios and Apliko.

36.     Upon information and belief, the Principal Action would not have come about but for the Loan.  As previously noted, the Loan only came about because Mr. Young agreed to participate in the Transaction, and Mr. Young only agreed to participate in the Transaction because H. Segal represented to Mr. Young that neither he nor his family would incur any liability as a result of the Transaction.

37.     At the time of Second Meeting, and on various occasions thereafter, H. Segal represented to Mr. Young, verbally and/or in writing, that H. Segal would indemnify Mr. Young for any liability incurred by Mr. Young as a result of the Transaction, including but not limited any legal expenses incurred by Mr. Young as a result of the Transaction.

38.     To date, H. Segal has not indemnified Mr. Young for any portion of the costs and expenses incurred by Mr. Young in connection with the Apliko and Principal Actions and has given no indication that he will do so in the future.

## COUNT I
### (Fraud)

39.     Plaintiff hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

40.     Prior and subsequent to Mr. Young's entry into the Transaction, and at all other times throughout 2008, H. Segal repeatedly represented to Mr. Young that neither Mr. Young nor his children would have any legal obligation under any of the loans that were part of the Transaction, *i.e.,* that the loans would be non-recourse, and that neither Mr. Young nor his children would otherwise have any liability to any party in connection with the Transaction.

41.     Both representations proved to be false because the Credit Agreement and Guaranty, on which Mr. Young's signature was forged, entitled HM Ruby, and its assignee Apliko, to seek recourse for nonpayment of the Loan against Mr. Young, and because Mr. Young has incurred extensive cost and expense as a result of the Apliko and Principal Actions, both of which concerned one of the loans involved in the Transaction.

42.     H. Segal knew that the aforementioned representations that he made to Mr. Young were false when he made them and/or made such representations recklessly without regard to whether they were true or false, as H. Segal was aware, at the time he made the aforementioned representations to Mr. Young, that the loans involved in the Transaction would not be non-recourse and that Mr. Young and/or his children could face liability in connection with the Transaction if one or more of the subject loans was not repaid.

43.     H. Segal made the aforementioned representations to Mr. Young to induce Mr. Young's participation in the Transaction, as H. Segal knew that Mr. Young would not have agreed to participate in the Transaction had H. Segal not represented to him that the loans in involved in the Transaction would be non-recourse, and that neither Mr. Young nor his children would otherwise face liability to any party in connection with the Transaction.

44.     Mr. Young justifiably relied on H. Segal's representations to him regarding the Transaction, in agreeing to participate in the Transaction, which ultimately led to the Apliko and Principal Actions being brought against Mr. Young.

45.     In and around the time that Mr. Young agreed to participate in the Transaction, H. Segal was aware that the Principal Policy would be funded through the Loan from HM Ruby and that, as a condition of such Loan, Mr. Young would be required to execute the Credit Agreement and Guaranty, or documents similar thereto.  This was in direct contrast to the information that H. Segal had previously provided to Mr. Young about the Transactions – that Omega would provide all of the loans necessary to fund the Policies and that neither Mr. Young nor his family would incur any personal liability as a result of the Transaction.  Nonetheless, H. Segal knowingly withheld such information from Mr. Young because he knew that Mr. Young would immediately seek to cease all participation in the Transaction upon becoming aware of such information.  Mr. Young did not become aware of the Loan until the commencement of the Apliko Action, well after the time Mr. Young agreed to participate in the Transaction and well after the time Mr. Young had any ability to cease participation in the Transaction.

46.     In addition to withholding information from Mr. Young about the Loan, H. Segal: helped bring about the forgery of Mr. Young's signature on the Credit Agreement and Guaranty; knowingly failed to ever provide Mr. Young with copies of such documents; and knowingly

failed to disclose the forgery of Mr. Young's signature on such documents until being presented with copies of such documents by Mr. Young subsequent to the commencement of the Apliko Action.  Because of these fraudulent acts, Mr. Young continued to remain a participant in the Transaction that led to him being sued in the Apliko and Principal Actions.

47.     As a result of H. Segal's fraudulent misrepresentations to Mr. Young regarding the Transaction and the fraud that H. Segal committed during the course of the Transaction, Mr. Young has incurred damages consisting of $125,000.00, representing the amount that Mr. Young paid to Apliko in order to settle the Apliko Action, plus the attorneys' fees and costs incurred by Mr. Young in connection with the Apliko and Principal Actions, the exact amount of which will be proven at trial.

## COUNT II
### (Negligent Misrepresentation)

48.     Plaintiff hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

49.     As the party responsible for presenting Mr. Young with the details of the Transaction and serving as Mr. Young's point of contact regarding the Transaction, H. Segal had a privity-like relationship with Mr. Young that imposed upon him a duty to impart true and correct information about the Transaction to Mr. Young.

50.     H. Segal failed to abide by his duty to impart true and correct information about the Transaction to Mr. Young, as H. Segal incorrectly informed Mr. Young that the loans involved in the Transaction would be non-recourse and that neither Mr. Young nor his children would otherwise face liability to any party in connection with the Transaction.  As described above, both of these statements were, in fact, false.

51.     Mr. Young relied on these untrue statements by H. Segal in agreeing to participate in the Transaction.  In fact, Mr. Young would not have agreed to participate in the Transaction had he been aware that the loans involved in the Transaction were not non-recourse, and/or that he or his children would face any liability to any party in connection with the Transaction.

52.     H. Segal also failed to abide by his duty to impart true and correct information about the Transaction to Mr. Young because H. Segal withheld from Mr. Young the fact that Principal Policy was funded by the Loan from HM Ruby, as well as the fact that the Loan required a personal guaranty from Mr. Young.  Had H. Segal provided such information to Mr. Young, rather than withholding it from him, Mr. Young would not have continued to participate in the Transaction.

53.     In addition, H. Segal did not abide by his duty to impart true and correct information about the Transaction because he: helped bring about the forgery of Mr. Young's signature on the Credit Agreement and Guaranty; knowingly failed to ever provide Mr. Young with copies of such documents; and knowingly failed to disclose the forgery of Mr. Young's signature on such documents until being presented with copies of such documents by Mr. Young subsequent to the commencement of the Apliko Action.

54.     As a result of H. Segal's negligent misrepresentations to Mr. Young regarding the Transaction, Mr. Young has incurred damages consisting of $125,000.00, representing the amount that Mr. Young paid to Apliko in order to settle the Apliko Action, plus the attorneys' fees and costs incurred by Mr. Young in connection with the Apliko and Principal Actions.

## COUNT III
### (Breach of Contract)

55.     Plaintiff hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

14

56.    Mr. Young and H. Segal entered into a valid and binding agreement to engage in the Transaction in accordance with the terms set forth in the Draft Agreement and Term Sheet.

57.    Pursuant to this agreement between Mr. Young and H. Segal, Mr. Young agreed to participate in the Transaction by: allowing H. Segal and Omega to procure the Policies on Mr. Young's life, signing the applications for such Policies, and providing H. Segal and/or Omega with access to Mr. Young's medical records and information.

58.    Mr. Young performed all conditions, covenants and promises which he was required to perform under the agreement with H. Segal by: allowing H. Segal and Omega to procure the Policies on his life; signing the applications for such Policies; and providing H. Segal and/or Omega with access to his medical records and information.

59.    Contrary to the agreements and promises made by H. Segal to Mr. Young, the loans to which the Transaction related were not non-recourse, as the Credit Agreement and Guaranty, on which Mr. Young's signature was forged, entitled HM Ruby, and its assignee Apliko, to seek recourse for nonpayment of the Loan against Mr. Young.  As result, H. Segal is in breach of his agreement with Mr. Young.

60.    Furthermore, and also contrary to the agreements and promises made by H. Segal to Mr. Young, Mr. Young was subject to liability in connection with the Transaction, as Mr. Young was forced to incur significant costs to defend and bring about settlement of the Apliko Action, including, but not limited to, the $125,000.00 settlement payment that Mr. Young made to Apliko, and was forced to incur further legal costs and expenses in connection with the Principal Action.  As a result, H. Segal is further in breach of his agreement with Mr. Young.

61.     As a direct and proximate result of H. Segal's aforementioned breach of his agreement with Mr. Young, Mr. Young has incurred damages consisting of $125,000.00, representing the amount that Mr. Young paid to Apliko in order to settle the Apliko Action, plus the attorneys' fees and costs incurred by Mr. Young in connection with the Apliko and Principal Actions, the exact amount of which will be proven at trial.

## COUNT IV
### (Breach of Contract)

62.     Plaintiff hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

63.     At the time of Second Meeting, and on various occasions thereafter, H. Segal represented to Mr. Young, verbally and/or in writing, that H. Segal would indemnify Mr. Young for any liability incurred by Mr. Young as a result of the Transaction, including but not limited any legal expenses incurred by Mr. Young as a result of the Transaction.

64.     Subsequent to the commencement of the Apliko Action, H. Segal re-affirmed his prior representations to Mr. Young by agreeing to indemnify Mr. Young for any and all costs and expenses incurred by Mr. Young in connection with the Apliko Action.  Such agreement by H. Segal to provide indemnity constitutes a valid and binding agreement between H. Segal and Mr. Young.

65.     H. Segal's repeated verbal and/or written representations to Mr. Young that he, H. Segal, would indemnify Mr. Young for any liability incurred by Mr. Young as a result of the Transaction also constitute a valid and binding agreement between H. Segal and Mr. Young for H. Segal to indemnify Mr. Young for any and all costs and expenses incurred by Mr. Young in connection with the Apliko and Principal Actions.

16

66. Mr. Young was forced to incur extensive costs and expenses in connection with the Apliko Action, including, but not limited to, the $125,000.00 settlement payment made by Mr. Young to Apliko and the attorneys' fees and costs that Mr. Young incurred to defend, and bring about the settlement of, the Apliko Action. Mr. Young was also forced to incur further legal costs and expenses in connection with the Principal Action.

67. Mr. Young has performed all conditions, covenants and promises which he was required to perform under the agreement(s) by H. Segal to indemnify Mr. Young for the Apliko and Principal Actions.

68. To date, H. Segal has failed to indemnify Mr. Young for any portion of the costs and expenses incurred by Mr. Young in connection with the Apliko and Principal Actions, in breach of H. Segal's prior agreement(s) to indemnify Mr. Young for such actions.

69. As a direct and proximate result of H. Segal's aforementioned breach of his agreement(s) to indemnify Mr. Young for the Apliko and Principal Actions, Mr. Young has incurred damages consisting of $125,000.00, representing the amount that Mr. Young paid to Apliko in order to settle the Apliko Action, plus the attorneys' fees and costs incurred by Mr. Young in connection with the Apliko and Principal Actions, the exact amount of which will be proven at trial.

## COUNT V
### (Promissory Estoppel)

70. Plaintiff hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

71. Prior and subsequent to Mr. Young's entry into the Transaction, and at all other times throughout 2008, Mr. Young received assurances from H. Segal that neither Mr. Young nor his children would have any legal obligation under any of the loans that were part of the

Transaction, *i.e.,* that the loans would be non-recourse, and that neither Mr. Young nor his children would otherwise have any liability to any party in connection with the Transaction.

72.     In agreeing to participate in the Transaction, Mr. Young relied on the assurances he received from H. Segal that the loans involved in the Transaction would be non-recourse, and that neither Mr. Young nor his children would otherwise have any liability to any party in connection with the Transaction.  In fact, Mr. Young would not have agreed to participate in the Transaction had he not received these assurances from H. Segal.

73.     In light of the discussions that Mr. Young had with H. Segal regarding the Transaction, it was both reasonable and foreseeable that Mr. Young would rely on the assurances provided to him by H. Segal that the loans involved in the Transaction would be non-recourse, and that neither Mr. Young nor his children would otherwise have any liability to any party in connection with the Transaction.

74.     Contrary to the assurances that Mr. Young received from H. Segal, the loans involved in the Transaction were not non-recourse, as the Credit Agreement and Guaranty, on which Mr. Young's signature was forged, entitled HM Ruby, and its assignee Apliko, to seek recourse for nonpayment of the Loan against Mr. Young.

75.     Also contrary to the assurances that Mr. Young received from H. Segal, Mr. Young was subject to liability in connection with the Transaction, as Mr. Young was forced to incur significant costs to defend and bring about settlement of the Apliko Action, including, but not limited to, the $125,000.00 settlement payment that Mr. Young made to Apliko, and was forced to incur further legal costs and expenses in connection with the Principal Action.

76.     Mr. Young relied to his detriment on the assurances he received from H. Segal --
that the loans involved in the Transaction would be non-recourse and that neither Mr. Young nor
his children would otherwise face liability to any party in connection with the Transaction -- by
agreeing to participate in the Transaction, which ultimately led to the Apliko and Principal
Actions being brought against Mr. Young.  Mr. Young was forced to incur extensive costs to
defend and bring about settlement of the Apliko Action, and was forced to incur further legal
costs and expenses in connection with the Principal Action.

77.     As a result of Mr. Young's reliance on the assurances that H. Segal provided to
him regarding the Transaction, Mr. Young has incurred damages consisting of $125,000.00,
representing the amount that Mr. Young paid to Apliko in order to settle the Apliko Action, plus
the attorneys' fees and costs incurred by Mr. Young in connection with the Apliko and Principal
Actions, the exact amount of which will be proven at trial.

**PRAYER FOR RELIEF**

Plaintiff respectfully request judgment against the Defendant as follows

1.     Judgment in favor of Plaintiff against Defendant on Plaintiff's First Cause of
Action;

2.     Judgment in favor of Plaintiff against Defendant on Plaintiff's Second Cause of
Action;

3.     Judgment in favor of Plaintiff against Defendant on Plaintiff's Third Cause of
Action;

4.     Judgment in favor of Plaintiff against Defendant on Plaintiff's Fourth Cause of
Action;

5.      Judgment in favor of Plaintiff against Defendant on Plaintiff's Fifth Cause of

        Action;

6.      Damages in an amount no less than $125,000, plus the attorneys fees and costs

        incurred by Plaintiff in connection with the Apliko and Principal Actions, the

        exact amount of which will be determined at trial;

7.      Plaintiff's reasonable attorneys' fees and costs incurred in connection with this

        action;

8.      Post-judgment interest at the maximum rate allowed by applicable law; and

9.      Such other, further and different relief as this Court deems just, proper and

        equitable.

Dated:     March 31, 2014


                                    **ARENT FOX LLP**


                        By:    /s/ Eric Adam Biderman
                               Eric Adam Biderman
                               biderman.eric@arentfox.com
                               1675 Broadway
                               New York, New York  10019
                               Telephone: (212) 484-3900
                               Facsimile:  (212) 484-3990

                               *Attorneys for Plaintiff*

# EXHIBIT A

# Term sheet for Arnold Young

- There are 3 policies issued on Mr. Young for $10,000,000 each (1 by AXA & 2 by Principal); and an additional 3 for $10,000,000 each (by Lincoln) that are waiting to be funded.

- Each of the policies is held in a separate trust (there are six Trusts, Jeffrey Kret is the Trustee on 3 Trusts an Avi Weiss is the Trustee on the new 3 Trusts), whose beneficiary is one of Mr. Young's children.

- Omega Capital is lending money to the Trusts to fund the policies, as follows:

| Company | Year 1 Premium | Year 2 Premium | Total |
|---|---|---|---|
| AXA | $472,700 | $236,350 | $709,050 |
| Principal #1 | $679,700 | $127,000 | $806,700 |
| Principal #2 | $679,700 | $127,000 | $806,700 |
| Lincoln #1 | $490,800 | $238,000 | $728,800 |
| Lincoln #2 | $490,800 | $238,000 | $728,800 |
| Lincoln #3 | $490,800 | $238,000 | $728,800 |
| **TOTAL** | | | **$4,508,850.00** |

- The loans are to the Trust, not to Mr. Young, and are non-recourse.

- The premiums on the Lincoln Policies can be paid quarterly or monthly; the 1st payment should ideally come out of Mr. Young's account.

- It is contemplated that the policies will be sold in two years, at which time the loans will be repaid and the remaining proceeds will be divided; 50% to Mr. Young and 50% to Omega Capital (according to conservative estimates, the profits on each policy should be approximately $1.5 million).

- If there is no market for the policies after 2 years, then Omega may continue to pay the premiums, in which case the 50/50 deal stays the same, or may lapse the policies (in which case they alone will incur the losses, but they are not obligated to continue to pay the premiums).

- Should Mr. Young desire to keep a $5,000,000 policy, then Omega Capital will pay the premiums until maturity and deduct the premium payments from Mr. Young portion of the proceeds.

# EXHIBIT B

DRAFT 11/10/08 (For Discussion Purposes Only)

### AGREEMENT

  **THIS AGREEMENT** ("Agreement"), dated as of November __, 2008, is made by and between **Omega Capital** ("Omega"); **Herman Segal, William Segal**; and **Arnold Young, David Young, Alise Panitch, Mindy Cohen, The Arnold Young 2008 ILIT** (u/a/d 6/23/2008), **The Arnold Young Irrevocable Insurance Trust** (u/a/d 4/1/08), **The Arnold Young Family Trust** (u/a/d 4/1/08), **The Arnold Young Trust** (u/a/d 9/10/2008), **The Arnold Young Family Trust** (u/a/d 9/10/2008) and **The Arnold Young Life Trust** (u/a/d 9/8/2008) (the trusts shall collectively be referred to hereinafter as the "Trusts" or individually as a "Trust.")   This Agreement shall set forth the obligations and arrangements made by and between the parties pertaining to certain life insurance policies (the "Policies") owned by the Trusts, as described in more detail below.

### RECITALS

  **WHEREAS, Arnold Young** is the grantor ("Grantor") of The Arnold Young 2008 ILIT (u/a/d 6/23/2008), The Arnold Young Irrevocable Insurance Trust (u/a/d 4/1/08), The Arnold Young Family Trust (u/a/d 4/1/08), The Arnold Young Trust (u/a/d 9/10/2008), The Arnold Young Family Trust (u/a/d 9/10/2008) and The Arnold Young Life Trust (u/a/d 9/8/2008), all irrevocable life insurance trusts;

  **WHEREAS,** the Beneficiaries of the Trusts are the Grantor's children, David Young, Alise Panitch, Mindy Cohen;

  **WHEREAS,** The Arnold Young 2008 ILIT (u/a/d 6/23/2008) is the Owner of a $10 million preferred-rated life insurance policy issued on August 18, 2008 by the Axa Equitable Life Insurance Company, designated policy number 158 212 340;

  **WHEREAS,** The Arnold Young Irrevocable Insurance Trust (u/a/d 4/1/08)is the Owner of a $10 million standard-rated life insurance policy issued on May 16, 2008 by the Principal Life Insurance Company and designated policy Number 6095482;

  **WHEREAS,** The Arnold Young Family Trust (u/a/d 4/1/08) is the Owner of a $10 million standard-rated life insurance policy issued on May 16, 2008 by the Principal Life Insurance Company and designated policy number 6095561;

  **WHEREAS,** The Arnold Young Trust (u/a/d 9/10/2008)is the Owner of a $10 million preferred-rated life insurance policy issued on _____ __, 2008 by The Lincoln National Life Insurance Company and designated policy number jj7049679;

  **WHEREAS,** The Arnold Young Family Trust (u/a/d 9/10/2008) is the Owner of a $10 million preferred-rated life insurance policy issued on _____ __, 2008 by The Lincoln National Life Insurance Company and designated policy number jj7049709;

**DRAFT 11/10/08 (For Discussion Purposes Only)**

**WHEREAS**, The Arnold Young Life Trust (u/a/d 9/8/2008) is the Owner of a $10 million preferred-rated life insurance policy issued on _____ __, 2008 by The Lincoln National Life Insurance Company and designated policy number jj7049723;

**WHEREAS,** the premium payments for the first year premiums on the Policies are Three Million Three Hundred Four Thousand and Five Hundred Dollars ($3,304,500.00) (the "First Year Premium Payments");

**WHEREAS,** the premium payments for the second year premiums on the Policies are One Million Two Hundred Four Thousand and Three Hundred Fifty Dollars ($1,204,350.00) (the "Second Year Premium Payments"); and

**WHEREAS,** Omega Capital has loan the First Year Premiums to the Trusts on a non-recourse basis and will advance the Second Year Premiums to the Trusts on a non-recourse basis when they become due with respect to the Policies;

**NOW THEREFORE,** in consideration of the premises and the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the following is agreed upon:

1.     **Ownership / Beneficiaries of the Policies.**

A.     Axa – Policy Number 158 212 340:  The nominal owner of this $10 million policy is The Arnold Young 2008 ILIT (u/a/d 6/23/2008).  The Trust is an irrevocable trust that has as its designated sole beneficiary, David Young.  Jeffrey Kret has been designated the initial Trustee.

B.     Principal #1 – Policy Number 6095482:  The nominal owner of this $10 million policy is The Arnold Young Irrevocable Insurance Trust (u/a/d 4/1/08).  The Trust is an irrevocable trust that has as its designated sole beneficiary, Alise Panitch.  Jeffrey Kret has been designated the initial Trustee.

C.     Principal #2 – Policy Number 6095561:  The nominal owner of this $10 million policy is The Arnold Young Family Trust (u/a/d 4/1/08).  The Trust is an irrevocable trust that has as its designated sole beneficiary, David Young.  Jeffrey Kret has been designated the initial Trustee.

E.     Lincoln #1 – Policy Number JJ7049679:  The nominal owner of this $10 million policy is The Arnold Young Trust (u/a/d 9/10/2008).  The Trust is an irrevocable trust that has as its designated sole beneficiary, Mindy Cohen.  Avi Weiss has been designated the initial Trustee.

F.     Lincoln #2 – Policy Number JJ7049709:  The nominal owner of this $10 million policy is Arnold Young Family Trust (u/a/d 9/10/2008).  The Trust is an

2

DRAFT 11/10/08 (For Discussion Purposes Only)

irrevocable trust that has as its designated sole beneficiary, is the beneficiary. Avi Weiss has been designated the initial Trustee.

G.   Lincoln #3 – Policy Number JJ7049723: The nominal owner of this $10 million policy is The Arnold Young Life Trust (u/a/d 9/8/2008). The Trust is an irrevocable trust that has as its designated sole beneficiary, Alise Panitch. Avi Weiss has been designated the initial Trustee. Pursuant to an Amendment to The Arnold Young Life Trust (u/a/d 9/8/2008), dated November __, 2008, Mindy Cohen was designated the sole beneficiary of said Trust.

## 2.   **Funding Policy Premiums.**

Pursuant to the schedule below, Omega Capital will advance funds to the Trusts to pay for the first 2 years of premium payments. The only parties to these loans are Omega, as lender, and the Trusts, respectively, as borrowers. The loans are non-recourse. The loan is collateralized only by the Policy. Neither Arnold Young, the Beneficiaries nor the Trustees have any legal obligation with respect to the loans. Any outstanding loan balance is payable solely from the receipt of sale proceeds upon the sale of any Policy or upon the payment of any death benefit. Interest with respect to each loan shall not exceed 16%, which is customary in premium finance arrangements.

| Company | Year 1 Premium | Year 2 Premium | Total |
|---------|---------------|---------------|-------|
| AXA | $472,700 | $236,350 | $709,050 |
| Principal #1 | $679,700 | $127,000 | $806,700 |
| Principal #2 | $679,700 | $127,000 | $806,700 |
| Lincoln #1 | $490,800 | $238,000 | $728,800 |
| Lincoln #2 | $490,800 | $238,000 | $728,800 |
| Lincoln #3 | $490,800 | $238,000 | $728,800 |
| **TOTAL** | | | **$4,508,850.00** |

## 3.   **Obligation of Continued Premium Payments During First Two Years.**

As an inducement to Arnold Young to obtain the Policies, Omega Capital has agreed to loan the Trusts such amounts for the First Year Premium Payments and the Second Year Premium Payments. After the two-year contestability period expires, it is anticipated that the Policies will be sold within a relatively short period of time.

If there is no market for the Policies after the two-year contestability period, Omega may continue to pay the premiums payments. If any Policy or Policies lapses, any losses sustained shall be solely Omega Capital. The Arnold Young and the Trust Beneficiaries shall have no obligation to Omega or any other party to make continued premium payments.

**4.     Repayment of Loans by Trusts to Omega.**

The term for each loan is the lesser of (i) the payment of death benefit proceeds to the Trusts; (ii) sales proceeds resulting from the sale of the policies; (iii) 27 months from the date such funds have been advanced to the Trusts.  The terms of the loan may be extended by further agreement between Onega Capital and each Trust.  Omega Capital will consult with Arnold Young on the extension of such term.

**5.     Distribution of Sales Proceeds or Death Benefits by Trusts.**

As compensation for obtaining and financing the Policies, the parties agree that any settlement payment with respect to, or death benefit payment attributable to the Policy or Policies shall be distributed in the following manner: (i) First, to the repayment of the Loan or Loans, including interest; and then (ii) 50% to the Beneficiaries / Mr. Young and 50% to Omega Capital.

**6.     General Provisions**

A.     Counterparts:  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

B.     Notices:  All notices, demands, statements and communications required hereunder shall be in writing and shall be sent to the following address (or such other address as either party may by written notice advise the party:

**Grantor / Insured**

Arnold Young
110 John Street
Clark, NJ 07066

**Beneficiaries**

David Young
116 Andover Lane
Aberdeen, NJ 07747

Alise Panitch
2113 Aqueduct Lane
Cherry Hill, NJ 08002

Mindy Cohen
2 Fox Hunt Drive
Monroe, NJ 08831

**DRAFT 11/10/08 (For Discussion Purposes Only)**

Omega Capital
1282 49th Street
Brooklyn, New York, 11219
Attn: Herman Segal, President

**The Trusts**

The Arnold Young 2008 ILIT (u/a/d 6/23/2008)
The Arnold Young Irrevocable Insurance Trust (u/a/d 4/1/08)
The Arnold Young Family Trust (u/a/d 4/1/08)

c/o Jeffrey Kret Trustee
565 Church Avenue
Woodmere, New York 11598

The Arnold Young Trust (u/a/d 9/10/2008)
The Arnold Young Family Trust (u/a/d 9/10/2008)
The Arnold Young Life Trust (u/a/d 9/8/2008

c/o Avi Weiss, Trustee
10 Forest Park Circle
Lakewood, New Jersey 08701

C.     Modifications and Waivers:     This Agreement cannot be changed or modified, and no breach hereof shall be deemed waived or released except in a writing executed by the party sought to be charged therewith. No delay in enforcing any right hereunder shall be deemed a waiver thereof, nor shall a waiver of any breach be deemed a waiver of any other or future breach hereof.

D.     Successors and Assigns:     This Agreement shall be binding upon and shall inure to and for the benefit of the parties hereto and their successors and assigns.

E.     Governing Law:     This Agreement shall be governed by, and construed and enforced in accordance with the laws of New Jersey.

F.     Miscellaneous:     Trustees hereby undertakes to advise and provide parties hereto with written notice and copies of any and all communications from the insurance company, the Trusts, and the Insured, including but not limited to advance notice of premiums due.

*SIGNATURE PAGE TO FOLLOW*

5

**DRAFT 11/10/08 (For Discussion Purposes Only)**

**IN WITNESS WHEREOF,** the parties have executed this Agreement the day and year first above written.

The Arnold Young 2008 ILIT (u/a/d 6/23/2008)

By: _____
      Jeffrey Kret, Trustee

The Arnold Young Irrevocable Insurance Trust (u/a/d 4/1/08)

By: _____
      Jeffrey Kret, Trustee

The Arnold Young Family Trust (u/a/d 4/1/08)

By: _____
      Jeffrey Kret, Trustee

The Arnold Young Trust (u/a/d 9/10/2008)

By: _____
      Avi Weiss, Trustee

The Arnold Young Family Trust (u/a/d 9/10/2008)

By: _____
      Avi Weiss, Trustee

The Arnold Young Life Trust (u/a/d 9/8/2008

By: _____
      Avi Weiss, Trustee

**Omega Capital**

By:_____
      Herman Segal,
      President

6